## IN THE MATTER OF THE ESTATE OF JOSE VICENTE DE LAVEAGA, DECEASED.

### [No. 15,120; decided December 6, 1899.]

**Legitimation of Child—Effect of His Status.**—A child legitimized by his father under section 230 of the Civil Code is as much a legitimate child as one born in lawful wedlock, and is to be deemed legitimate for all purposes from the time of his birth.

**Legitimation of Child—Necessity of Marriage.**—It is not essential to the legitimation of a child under section 230 of the Civil Code that his parents should marry.

**Legitimation of Child—Collateral Inheritance.**—A child born illegitimate, but legitimated by his father under section 230 of the Civil Code, may be an heir of his father's brother, though his parents never married.

**Legitimate Children—Classification of.**—Legitimate children may be classified under our statute as (1) children born of a lawful marriage; (2) children born of parents who subsequently married; (3) children born of a null marriage; (4) children legitimated by the act of their father, without a marriage of the parents. There seems to be no distinction among these classes as to any right whatever.

**Legitimated Child—Sections 230 and 1387.**—Section 1387 of the Civil Code has no application to a child legitimated by his father

under section 230 of the same code, without a marriage with the mother.

**Legitimated Child—Rules of Succession.**—When illegitimate children are legitimated, their capacity to inherit results as an incident to their status, and the law governing their rights and succession is the general law which establishes the rules of succession applicable to the children born in lawful wedlock.

**Illegitimates—Succession—Sections 1386 and 1387.**—Section 1386 of the Civil Code contains the rules of succession which govern in the case of legitimate children, while section 1387 is limited in its scope to prescribing rules of succession by and from illegitimate children, who are allowed, in spite of their continuing illegitimacy, to inherit on certain conditions both lineally and collaterally.

**Illegitimate Child—Succession—Section 1387.**—Section 1387 of the Civil Code is designed to establish a rule of succession by and from illegitimate as contradistinguished alike from children legitimate by birth and from legitimated children.

Petition of Maria Josefa Cebrian and Maria Concepcion de Laveaga for partial distribution, and the answer and cross-petition of A. J. M. de Laveaga.

T. J. Lyons and G. W. McEnerney, for the petitioning sisters and brother M. A. de Laveaga.

J. J. Dwyer, T. F. Barry and John Garber, for Anselmo J. M. de Laveaga, claiming to be son of deceased brother.

Daniel Rogers, for executors.

COFFEY, J.   This is an application by the two sisters of the decedent, asking for distribution of the property of the estate to them and to their brother Miguel A. de Laveaga, as the next of kin and heirs, filed December 4, 1896. This application the executors answered formally on December 16, 1896, putting in issue, however, nothing material in this controversy.

On January 11, 1897, an answer to the petition of the sisters was filed on behalf of one Anselmo Jose Maria de Laveaga, in which he alleged that he is one of the heirs at law and next of kin of said Jose Vicente de Laveaga, deceased, and averred, in support of his claim, that he was and is the

only son and the only child and only living offspring and sole heir at law and sole next of kin of said Jose Maria de Laveaga, a brother of said Jose Vicente, and mentioned as such brother in the petition of the sisters; that he was born April 21, 1868, and is now over the age of majority and that on the first day of October, 1873, and prior thereto he was and thence hitherto has been and still is a resident of the city and county of San Francisco, and domiciled therein, and a citizen of the said state of California and of the United States of America; that said Jose Maria de Laveaga was on the first day of January, 1872, and prior thereto and thereafter and until his death a resident of the said state of California, and domiciled therein, but died without said state of California, while temporarily absent therefrom in the state of Colorado, on or about April 21, 1880; that said Jose Maria was never married, and that the respondent was born of him and Basilia Sanchez; that said Jose Maria never had any family; that within the said state of California after the birth of the respondent and previous to the death of said Jose Maria the latter did publicly acknowledge the respondent as his own child and did support, maintain, and educate him as his child, and did otherwise treat respondent as if he were a legitimate child of said Jose Maria, and did thereby adopt him as and for his legitimate child, and did legitimate respondent, and thereby respondent became for all purposes the legitimate child of said Jose Maria de Laveaga from the time of respondent's birth; that said Basilia Sanchez died before respondent attained the age of six years; that subsequently to the death of Basilia and before respondent attained the age of six years, Jose Maria took respondent into his custody and control and under his protection in said state of California and continued to have and exercised such custody and control in said state as his father, and in a fatherly manner continuously thereafter until the death of said Jose Maria, and from on or about the 20th of September, 1873, thereafter until his death said Jose Maria caused respondent to be cared for, nurtured, maintained, reared and educated in said city and county of San Francisco by Dr. Wilhelm Dohrmann, who was a friend of respondent's father, and in the household and family of said Dr. Wilhelm Dohrmann,

who was a married man, and who with his wife acted by the direction, consent, request, and procurement of said Jose Maria as the foster-parents of respondent, for which said services said Doctor Wilhelm Dohrmann was paid considerable sums of money by said Jose Maria de Laveaga; that said Jose Maria, dying, left a last will bearing date the eighth day of November, 1877, made and executed on the day of its date, entirely written, dated and signed by his own hand, and also witnessed by two subscribing witnesses, A. M. Abrego and Green Devaul, who at the time of the making and execution thereof by said testator and at the time they subscribed their own names as witnesses thereto were competent witnesses; and in said will subscribed and signed by said testator Jose Maria de Laveaga in the presence of said two competent witnesses, he the said testator did acknowledge himself to be the father of respondent and that respondent was his own child.

The said will and attestation clause are as follows:

"In the Name of God, Amen.

"I, Jose M. de Laveaga, of Los Aguilas Ranch, San Benito County, State of California, of the age of 33 years, 1 mth. & 27 days, and being of sound and disposing mind, and not under any restraint, or the influence or representation of any person whatever, do make, publish and declare this my last Will and Testament, in manner following, that is to say—

"First. I direct that my body be decently buried without undue ceremony or ostentation; but with proper regard to my station and condition in life, and the circumstances of my estate.

"Secondly. I direct that my executors hereinafter named, as soon as they have sufficient funds in their hands, pay my funeral expenses, and lawful debts.

"Thirdly. Whereas all my kindred and relations are in good and easy circumstances, I herewith distinctly declare that I do not give, bequeath nor devise anything to any of my kindred or relatives however near; with the exception of my brother, Jose Vicente, and this only in below specified case; but give, bequeath and devise all of my property to my son Anselmo Jose Maria, born in Mazatlan, Mexico, to

Basilia Sanchez, deceased, on the twenty-first day of April, eighteen hundred and sixty-eight, and to-day residing with Doctor Wm. Dohrmann at No. 535 Bryant street, corner of Zoe, to the exclusion of all and everybody else, as this is the only child, I swear before God and men, to have.

"Fourthly. I wish to have it understood that said Anselmo Jose Maria, will not enter into possession of anything now belonging to me, before he reaches his full age and has learned some profession, for which purpose the executors hereinafter named will give him a thorough education.

"Fifth. In case of death of said Anselmo Jose Maria, all of my estate goes to my brother Jose Vicente de Laveaga.

"Lastly. I hereby appoint my said brother Jose Vicente de Laveaga and my friend Frederick W. Dohrmann (of the firm of B. Nathan & Co.) both of the City of San Francisco, California, the executors of this, my last Will and Testament; hereby revoking all former wills by me made.

"In Witness Whereof, I have hereunto set my hand and seal this eighth day of November, in the year of our Lord one thousand eight hundred and seventy-seven.

"J. M. de LAVEAGA.    (Seal.)

"The foregoing instrument, consisting of one page besides this, was, at the date thereof, by the said Jose M. de Laveaga, signed and sealed and published as, and declared to be his last Will and Testament, in the presence of us, who, at his request, and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"A. M. ABREGO,
"Residing at the Los Aguilas.
"GREEN DEVAUL,
"Residing at the Los Aguilas."

On the 9th of December, 1895, this paper was admitted to probate as the last will and testament of said Jose Maria and still subsists on the record in that form. That in and by another instrument in writing signed and subscribed by said Jose Maria de Laveaga in his lifetime in the state of California in the presence of two competent witnesses, to wit, F. A. Schröder and Dr. Wilhelm Dohrmann, which said witnesses were competent at the time of the signing and subscription

thereof by the said Jose Maria de Laveaga and by themselves, and which said witnesses subscribed their names respectively thereto as such witnesses at the request of said Jose Maria de Laveaga, said Jose Maria de Laveaga did publicly acknowledge respondent to be his own child and that he was the father of respondent. Said written instrument last referred to is in the German language and the following is a full, true and correct translation thereof:

"DONE

"San Francisco, California.
"May 24th, Anno 1878.
"         "         "

"By these presents and by my name, hereunto subscribed with my own hand, I, Joseph Maria de Laveaga, before and in the presence of the witnesses whose names have been likewise hereunto subscribed with their own hands, and being in the full possession of my intellect and in good health, (having come here temporarily from my rancho, Los Aguilas, San Benito County), do truthfully and solemnly declare:

"That the boy, born in Mazatlan, Mexico on April 21st, Anno 1868, therefore at present 10 years old, named Joseph Anselm Sanchez, who, since September 20th of the year 1873, has been and is now, living as a foster son with Wilhelm Dohrmann, M. D., engaged here in medical practice, and with the latter's family, is my own son, and is hereby acknowledged as such by me, his own true father, before these witnesses orally and in writing, just as I have already after the death years ago of his own mother, Basilia Sanchez, by means of a testamentary disposition (that is, to say, years ago) made him my sole and only lawful heir of the estate to be left by me, and I hereby repeatedly acknowledge and confirm him with all his legal claims of inheritance and other rights and consequences connected with and in law and justice arising out of this my acknowledgment, which an own son may have.

"Whereof this preliminary instrument is witness (viz., of this my act of acknowledgment) (and at the same time of

the previous testamentary disposition as to the inheritance of my estate) amongst the living and in case of death, reserving compliance with the further formality, if required by law, of a proper notarial instrument and other like things, which owing to the absence of the Notary Public, Mr. E. V. Sutter, of this city, will be effected and regularly done in addition hereto after his return.

"Thus done and subscribed, under date and in the year, as above, on May 24th, 1878.

"J. M. de LAVEAGA.

"As witnesses and for the genuineness of the above signature.

"F. A. SCHRODER,
"WILHELM DOHRMANN,
"Dr. M."

The original is here copied as follows:

"ACTUM.

"San Francisco, California,
"den 24sten May Anno 1878.

"Hinmittelst, und mit meiner eigenhandigen Namens-Unterschrift, erkläre ich,: Joseph Maria deLaveaga, vor und in Gegenwart gleich falls eigenhandig mit-unterzeichneter Zeugen, bei vollem Verstande, und guter Gesunheit, (allhier, von meinem Rancho Los Aguilas, San Benito County, zeitweilig anwesend) wahrheitsgemass und feierlichst:

"dass der, seit dem 20sten September des Jahr's 1873, und noch jetzt, bei dem hier arztlich practisirenden Dr. M. Wilhelm Dohrmann, und in dessen Familie, als Pflegesohn, befindliche Knabe, geboren in Mazatlan in Mexiko am 21sten April Anno 1868, mithin gegenwartig 10 Jahre alt, Namens:

II     I

"Joseph Anselm Sanchez, mein leiblicher Sohn ist, und, als solcher, von mir, als seinem rechten, leiblichen Vater, hinmittelst mundlich, wie schriflich, vor diesen Zeugen, anerkannt wird, wie ich denn auch selbigenm nach seiner, vor Jahren bereits verstorbenen leiblichen Mutter: "Basilia Sanchez", erfolgtem Tode, mittelst testamentlich er Bestimmung, (resp: vor Jahren) als meinen einzigen und alleinigen rechtmassigen Erben meiner einstigen Vermogens-Hinterlassen-

schaft, bereits eingesetzt habe und hiemittelst, wiederholt, mit allen seinen rechtmassigen, und mit dieser, meiner Anerkennung, verbundenen und rechts- und gesetzmassig sich ergebenden Erbshafts- und sonstigen Anspruchen und Folgerungen meines leiblichen Sohnes, anerkenne und bestatige:

"Solches zur vorlaufigen Urkunde: (dieser meiner Anerkennungs-Acte) (wie der resp: vorangegangenen testamentlichen Erbschafts -Einsetzung zugleich) um Lebens- und Sterbens willen, unter Vorbehalt weiterer gesetzmassig erforderlichen, demnachst ein-und nachzuholenden Formalitat eines desfalsigen Notariats-Instruments, s. w. d. a. welches, in Abwesenheit des Notarius publicus, Herrn E. V. Sutter, hierselbst, nach seiner Ruckkehr auf hier, des Weiteren effectuirt und zur Ordnung gebracht werden wird.

"So geschehen und unterschrieben sub. dat. et in anno, ut supra, den 24 May 1878.

"J. M. de LAVEAGA.

"Als Zeugen und fur die eigenhandige obige Namens-Unterschrift:

"F. A. SCHRODER<br>"WILHELM DOHRMANN,

"Dr. M."

This is the actum so-called from the word in the original "actum" rendered "done" at the head of the foregoing translation.

That said Jose Maria de Laveaga and the witnesses Dr. Wilhelm Dohrmann and F. A. Schröder all spoke and wrote the German language fluently and used it in conversation and in writing among themselves, and they all thoroughly understood the contents of said written instrument; that this respondent is the person designated by the name Anselmo

II    I

Jose Maria in the will and the same Joseph Anselm Sanchez in the other instrument; that by reason of these facts he is entitled to share as heir and next of kin in the distribution of this estate, and he prays judgment accordingly. On the 13th of December, 1897, the sisters made answer to the claim of the respondent denying its essential averments. The issues thus joined came to trial on Wednesday, October 5th, 1898.

The claim of Anselmo is based entirely upon the Civil Code, section 230, and must rest upon the proofs required to be produced showing paternity and legitimation.

"Sec. 230. The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth."

The first point to be proved under the statute is the illegitimacy of the claimant, and that has been established in this case without question from any source. It has been shown conclusively that the mother of the boy Anselmo was never married. The next question is as to paternity. Jose Maria was an unmarried man, and, therefore, presumptively childless. In order to substantiate this claim it must be shown that the child was illegitimate, and the fact of paternity must be established by strict and plenary proof; it must be demonstrated without shadow of suspicion to taint it. Can it be said that this petitioner has proved paternity in the strict manner and to the full extent of the statute? Has the status of the Civil Code, section 230, been established in this case in any of its elements? Is there evidence here of any intercourse between the maiden mother of this boy claimant and the bachelor Jose Maria? It is denied in argument that there is anything in the record competent to show that the two had any sexual relation, or that this child was the fruit of such commerce, or that such fact can be logically or legally inferred from propinquity or opportunity, and it is argued that it must be manifest that Jose Maria and he alone had access to the mother antecedent to the birth of the boy, and that the testimony here produced is insufficient on that point.

The senior Don Jose Vicente de Laveaga came with his family to San Francisco, arriving in April, 1867; the household consisted of himself, his wife, three daughters, his son, Jose Maria, two maiden sisters of his wife and two servants Basilia Sanchez and Josefa Lopez; Basilia Sanchez had been in their employ four years. Two sons, Jose Vicente, junior, and Miguel, were then in Europe, for education, as Jose

Maria had been also for a time, returning in 1862 to Mazatlan and remaining in the household until arrival in this city. Jose Maria was then about twenty-three years old, having been born September 11, 1844. Preparations had been made for the reception of the family in San Francisco, as the senior Don Vicente, a man of method and precision and exactness as to detail had arranged in advance through his friend Goyoneche, already resident here, for a proper habitation, to which they immediately repaired upon their arrival.

They were met at the wharf by Goyoneche and one "Pepe" Torrontegui, an old-time Mexican acquaintance in a humble way of the de Laveaga family, who offered his assistance in the transference of their effects to their selected domicile on Silver street; in this house they remained but a short time, when they removed to 512 Dupont street, where the cause of this controversy had its origin. This man "Pepe," or Jose Torrontegui, claims to have known Jose Maria from a child and as an intimate friend, and his father before him, with whom he first became acquainted in Mazatlan and the mother also. He was in their family residence in that city several times and knew them all, living and dead. Nachita, diminutive for Ygnacia, "Pepe" or Josefa, Maria, were three sisters of Jose Maria. Their father was Don Jose Vicente de Laveaga and the mother Dona Dolores Aguirre de Laveaga. Torrontegui testifies that he first saw the family here on the steamer when they arrived at Folsom street wharf where he had gone to meet them in company with Tomas Goyoneche. There were with the family two female servants whose names he did not then know, but supposed to be passengers. He subsequently learned their names as Basilia and Josefa. The family went to live in a house on Silver street, between Third and Fourth; in company with Torrontegui and Goyoneche they went direct from the steamer to that house; Jose Maria went there also to live with them. This witness visited that house and saw the family there, saw the girl Basilia there perhaps once or twice; from Silver street the family moved to Dupont street; Torrontegui's mother knew Jose Maria very well indeed; the latter used to visit the family of the witness at least once a week and there was great intimacy between them; on one occasion Jose Maria came to Torron-

tegui in great trouble concerning Basilia, who he said was in the family way and he came to consult as to what he should do; the mother of witness was present when Jose Maria called on that occasion and made the communication as to the condition of Basilia; he said that he had fallen in love with Basilia, the consequence of which was that she was pregnant, and he wanted to know the best thing he could do with her, whether he should send her back to Mazatlan; he said that his aunt Isabel knew of the incident and wanted the girl sent to Mazatlan; this aunt was the one who bossed the house; his eldest sister "Nacha," or Ygnacia, wanted the girl sent to Contra Costa, but the doctor advised Mexico; Jose Maria told witness that Basilia died after she left here in Mazatlan; when the steamer was leaving for Mexico he said to him, "I am sending her back to Mexico"; the day after she went away he said, "Now, Basilia is gone away"; he said subsequently that he was no longer afraid that his father would know of the girl's being in the family way. When this witness visited the house of the de Laveagas on business about two months before the girl left he noticed from the enlargement of her figure that she was pregnant; after the girl had gone to Mazatlan Jose Maria came to see the Torronteguis and told them that he had received a letter from Mazatlan and that the girl had given birth to a male child; they congratulated him now that he had an heir of his name; he returned thanks and said that he intended the child should receive a good education and be well cared for; subsequently he told of the death of Basilia, the mother of the child; he said that the child was in the same place when Basilia died; he used to speak of the child as "My child" "my little one," in Spanish and seemed very happy; witness knew that Jose Maria was dead because he saw him with his own eyes; he saw him when Jose Maria left for Colorado, he came to take leave of the Torronteguis, and the old lady said to him, "My son," she had so much confidence with him that she used to talk with him in that way, "What are you going to do at such a distance? You have money enough to do business here. What do you want to go there so far away for, where there are Apaches and other Indians?" He said that he wanted to go there to see if he could make some

money, and that he thought that he could leave the child
here with his brother Vicente; witness knew that Jose Maria
had been a clerk in San Francisco in the office of Lemmen
Meyer; he told Torrontegui that he had left his father's
house because his sister ''Nacha'' wrote a letter to a friend
Josefa Castelo in Mazatlan, informing her that Basilia was
going there sick and to take charge of her, and the friend an-
swered that Basilia had arrived and that the sickness was that
she was with child by Jose Maria; this answer was received by
Nacha while the family was at table and Nacha read it and be-
gan berating her brother, until he became incensed and struck
her, knocking her and the chair over on which she was seated,
and then took his hat and left the house; Jose Maria spoke
about the child many times; Jose Maria had three aunts,
Isabel, Trinidad, and ''Panchita'' or Francisca; Panchita
died when Torrontegui was small, at the time of testimony
he was sixty-six years old; the two other aunts died here;
Jose Maria told him that his aunt Isabel and sister ''Nacha''
or Ignacia ''bossed'' the house; that the mother did nothing;
he told him that the result of his amour was that Basilia
was pregnant and that he said to his sister that the girl was
sick and to send for a doctor, but Nacha refused and told
him to go himself, and he did and he brought a physician,
a German, to whom he confided her condition, and the doctor
agreed to conceal the truth and to advise that it was neces-
sary to send Basilia away to insure her recovery. Nacha
wanted to send her to Contra Costa, but the doctor insisted
that the girl must go to Mexico, as her sickness was of such
a nature that in that climate alone could a cure be effected,
and as the steamer was in and going out next day it was
arranged that Basilia should take passage thereon and she
did so, and the day after the departure Jose Maria called
upon Torrontegui and appeared much elated at the success
of the stratagem which he said would avoid scandal in the
family, and he had no fear now that his ·father would dis-
cover the fact, and Nacha and the others did not know nor
suspect the truth. Torrontegui knew Natalia Aguirre, whose
grandmother was his mother's cousin; and it was this Natalia
that brought the child from Mexico. The de Laveagas used to
attend church at St. Francis on Vallejo street; where the

witness used to dust the pews, attend to collections, and discharge other duties of that kind, open the doors, and otherwise assist in the time of Father Aerden. Jose Maria was not much accustomed to attend church, and when he did come he entered by another door than that through which the family came. In the afternoon of Sundays Dona Dolores and Don Vicente, the elder, always went to the convent on Powell street, the Presentation, between Greenwich and Lombard streets; Maria, the little one, was with them; Jose Maria did not go with them, but asked Torrontegui to look out when they were going, and he would do so and then tell him, and then both would go and observe the family on their way; after they saw them going to the house Jose Maria would say that he was satisfied with the sight of his parents, and now he could sleep with pleasure having seen them; all this was repeated every Sunday until the father became ill, when he recalled Jose Maria to the house; Torrontegui was at the funeral of old Don Vicente and of all the members of the family that died here, including Don Jose Maria de Laveaga.

The foregoing is the substance of what counsel for the sisters stigmatizes as the " worthless tale of Torrontegui,'' which, however, was repeated without material variation, during the protracted cross-examination and which is substantially corroborated by other evidence on the part of the claimant, the most important items of which are documentary, namely, the will of November 8, 1877, and the so-called actum of May 21, 1878, hereinabove transcribed in which he expressed his conviction of fatherhood.

Counsel for the sisters treats these testimonies tersely in comment thereon, summarizing as to paternity that there is no proof of antecedent relations except admissions of Jose Maria; no proof except the same and the evidence of Torrontegui of the career of Basilia in San Francisco; that the child was not baptized in the name of de Laveaga and never used the name in that form until 1895; that there was no reception into the family nor into the house or home of Jose Maria; that Jose Maria caused the boy to be held out to the world as the son, or at least of the kin and blood, of the Dohrmanns; that the boy grew up not knowing that Jose Maria was his father and never took his name, and no rea-

son is given why he did not; all that Jose Maria did for the boy was to pay his board, a dollar a day; most of the admissions of paternity had to be made and were born of necessity; neither the actum nor the will ever left his possession, or if they did, for a short time and for use after death; at the very time Jose Maria was admitting paternity, he was also denying it to a larger world, to wit, the school world and the neighborhood.

So far as this summary is concerned, it is hardly to be expected that claimant should be required to establish by direct ocular evidence the sexual process of procreation or the act of begetting. We should consider the circumstances of the parties, what one of the counsel calls their environment. At the time of the arrival of the family the inmates of the household were Don Jose Vicente, the elder, his wife, their three young daughters, Jose Maria, then about twenty-two or twenty-three years of age, the two aunts, Ygnacia and Isabel, and the two maid servants, Basilia and Josefa. There is no evidence whatever tending to show that Basilia was the recipient of the attentions of any suitor or in the habit of consorting with any man, nor is there anything implicating anyone other than Jose Maria in her misfortune nor pointing in any manner to another as the author of the child born on April 21, 1868, in Mazatlan in the house of her sister Juliana, with whom she lived after her return to that place, and with whom she remained until her death on May 15, 1872. This child was baptized at the Parish Church by the name of Anselmo Jose Maria, the first name on account of the Saint's day, and of the custom of the church and of the country, the other names, the Christian names of the father, the surname not being a necessity of the ceremony. The circumstances alluded to in addition to the other evidence leads irresistibly to the conclusion that Jose Maria was the father; that upon the boy's arrival in San Francisco after the death of his mother he was committed to the custody of the Dohrmanns, and the fact that he was for a time known by their name, and was by them sent to one school or another and entered by their name does not destroy the force and effect of the evidence as to the fact of paternity, however much it may affect the question of public acknowl-

edgment. There is no doubt in my mind from the evidence that the flight of Basilia to Mexico was contrived by Jose Maria upon a pretext devised by him in dread of his father's wrath, if he should discover the stain upon his name caused by a low intrigue of a son with a servant, and that upon the revelation incident to the reception of the letter received by his sister, as related in the evidence, his extrusion followed from his father's house, to which he never returned and with whom he was never reconciled until he was called back on the eve of the elder don's death March 14, 1874.

The fact of paternity has been plenarily proved in this case by the only possible proof of such a fact in any case. The declarations of the father in that respect are the best and only proof of paternity of an illegitimate. There is no doubt upon the evidence that claimant Anselmo was born of Basilia Sanchez, maiden, and there is no proof that any man but Jose Maria de Laveaga had access to her prior to plaintiff's birth, and the declarations, numerous and emphatic and in solemn written documents, show conclusively paternity; the evidential force of these contentions is incontestable, consequent upon the uncontested fact of illegitimacy. It must appear that the child is illegitimate, for such only are the objects of this statute's solicitude; the declarations of the alleged father can have no tendency to prove the fact of illegitimacy, but when it is established otherwise by evidence the declarations are effectual in proof of paternity.

So far it is shown that the boy claimant was illegitimate and that Jose Maria de Laveaga, an unmarried man, was his father. It remains to be resolved whether the statute in other respects has been satisfied, so as to confer upon this claimant the status of a legitimate child. The statute is headed "Adoption of Illegitimate Child," and the acts resulting in such adoption must be performed by the father, and the consequence of such performance is the legitimation of the child for all purposes from the time of its birth. The method of acquiring such status is prescribed by law and the statute furnishes the evidence and the only proper and competent evidence of the acquisition of the status. If Jose Maria de Laveaga performed toward the child the duties which

would have devolved upon him as the father of a legitimate child, namely, those of protection, maintenance, and education suitable to his circumstances, he treated him as his legitimate child; and when the status was thus fixed, it could not be affected by subsequent acts of the deceased, by failing to name him in his will, or by repudiation in any other manner. The statute, together with such acts done under it as will constitute an adoption, fixed the status of the illegitimate irrevocably: In re Jessup, 81 Cal. 458, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.

The three steps that must be taken, as elements of legitimation, must be taken by the father and no one else: 1. Public acknowledgment of the child as his own; 2. Reception into his family; 3. Otherwise treating the child as if it were legitimate.

The lines of demarcation between these steps are not clearly drawn, are not as distinctly defined as they might be, but while they are more or less indeterminate they are not mutually exclusive; they seem to overlap, but taken together in their ordinary significations they give a clear enough meaning of the legislative intent and while not capable of exact definition so as to fit every case, they may be applied with sufficient facility in cases as they occur where the evidence is clear. Now, what does each of these terms mean? Public acknowledgment as his own child; not merely an admission of paternity, but something more: (a) It must be an acknowledgment; (b) It must be a public acknowledgment; and it may be by conduct as well as by words.

If it may fairly and logically be inferred from all the facts in evidence that Jose Maria de Laveaga acknowledged in the manner indicated this claimant as his own child the latter must be deemed legitimate: Bailey v. Boyd, 59 Ind. 292.

The sum of the acts in the process of legitimation is, the actual public assumption and exercise of the parental duties owing to a legitimate child. The law imposes duties but also confers rights upon the father of a legitimate child. When he complies with section 230 of the Civil Code, he acquires rights of a father and becomes subject to the duties; for example, (1) becomes heir of the child, (2) acquires a

right to its custody, services, and earnings, under section 197 of the Civil Code. So, if a child acquires the capacity of inheritance from the father's lineal or collateral kin, they acquire reciprocally the like capacity as to the child. The relation may be mutually repugnant but it is that of the law.

Did Jose Maria de Laveaga perform those acts which resulted in the legitimation of this child? After the death of Basilia in Mexico, her sister, Juliana, nurtured the child until he was sent for by Jose Maria, who received him on Sunday, September 21, 1873, and took him immediately to the house of Dr. Wilhelm Dohrmann, 535 Bryant Street, where he had arranged for his care. This gentleman had come to San Francisco in 1868 and was highly respected for his character and attainments. He was a medical doctor and an accomplished linguist in German, his mother tongue, in French and other languages, including the classics; his English he acquired after his arrival here. At first the doctor dwelt in the house of his son Frederick W. Dohrmann, but after about a year he and his wife took a house for themselves, first on Filbert street, and finally at 535 Bryant street, where the old doctor and his wife, who was the stepmother of Frederick, kept house. The doctor died in June, 1886; his wife survived him about eight years.

In this household Jose Maria placed the child pursuant to an agreement to pay for his board and care and education one dollar a day. This agreement had its origin as related by Frederick W. Dohrmann in several conversations he had with Jose Maria de Laveaga about this boy, prior to the latter's arrival in San Francisco, the substance of which conversations was that Jose Maria made inquiry as to whether Frederick Dohrmann had any objection to a boy being placed in the house and under the care of his father, the doctor, he compensating for the care; the arrangement was consummated and the boy placed accordingly. It was in that house that Frederick Dohrmann saw the boy subsequently in company with Joseph as he was accustomed to designate Jose Maria; the boy was called "Joe." Frederick Dohrmann had several conversations with Jose Maria after that about the boy, of whom he spoke in German as "Mein junge" or "der junge," equivalent in English to "my youngster"

or "the youngster." He also called the boy "Joseph"; the Doctor's wife, that is, the stepmother of Frederick, would also call him "Joseph"; others familiar to the household would call him "Joe" for short; the doctor was at this time about sixty-three years of age, the Dohrmanns were not related to the boy nor to the de Laveagas; in one of the conversations with Jose Maria about the boy he said he wanted him to learn German well, and did not care if he forgot his Spanish; he was apparently affectionate toward the child and anxious about his mental development; on the occasion of the doctor's birthday and other holiday celebrations at the house the de Laveaga brothers were accustomed to visit there, and at one time or other Frederick Dohrmann saw all of them there, and he remembered well Jose Maria and Jose Vicente de Laveaga; all the members of the Dohrmann family were present at such times, Mrs. Paulsen, a sister, three brothers now deceased, the partner of Frederick, B. Nathan and his wife; his own children and other children would be there in the daytime to gratulate but not in the evening when the elders would assemble; the boy Joseph would always be there. After the death of Jose Vicente, Frederick Dohrmann received from the executors certain papers in envelopes which are identified and in evidence.

This Frederick W. Dohrmann is a person who, in conjunction with Jose Vicente de Laveaga, was nominated by Jose Maria executor of his will, which was among the papers found in one of the envelopes delivered to him by Mr. Daniel Rogers, after the death of Jose Vicente, of whose will Rogers was an executor. The so-called actum was another of the papers received by him in like manner and at the same time. It would seem from this that the existence and whereabouts in San Francisco after the arrival of the boy was not unknown to some members of the family of Jose Maria, although the latter had become a permanent absentee from his father's house. Some of them were frequent visitors at the house of Dr. Dohrmann.

At this point it may be pertinent to epitomize the comments of counsel for the sisters upon the relations of Jose Maria to his family at the time just indicated.

Counsel in alluding to the arrival of the boy Anselmo September 21, 1873, remarked that five months and twenty-four days thereafter to a day Don Jose Vicente, senior, died. This date is important and should be lodged in the reserved cells of the memory of the court in connection with the arrival of Anselmo in San Francisco. For nearly six months after Anselmo's arrival the senior Don Vicente de Laveaga was living; he was the head of the family of which Jose Maria was a member, and there is nothing in this case to justify the conclusion that the relations between him and his father were not filial and paternal, nothing to warrant the deduction that Jose Maria had no home in which to receive this boy; the contrary is shown by the correspondence of Jose Maria and by the testimony of Miguel and Mrs. Cebrian. This was the situation of domestic affairs in this city. While he was at the rancho Los Aguilas he had there a home which could have been made fit to receive this child; he was not received there at all; in no sense is there here established a ''reception into the family'' or home, although there was a family and a home into which this child might have been introduced: This important element is lacking in the case. The burden was upon the claimant to prove this as a step essential in the progress of his pretensions; he has not proved it and it is satisfactorily disproved throughout the family correspondence, in the two hundred and seventy-eight letters from Jose Maria to Jose Vicente from 1871 to 1880; in the forty-six letters from Jose Maria to Miguel A. during the same period, in the letters of Jose Maria to his mother, and in the testimony of Miguel A. and the Cebrians. It appears from these evidences that the relations of Jose Maria with the family were pleasant and friendly, and that the reason why he left home originally was the keeping of late hours which was distasteful to his father, who desired his children to observe punctual and regular habits, which desire we find perpetuated in his will in the request to his wife not to allow his son Jose Maria to reside with her and her daughters, as the peace and convenience of all his children required it should be so. The status of this boy was in no manner brought home to the family of which his alleged father was a member, neither by name nor otherwise. He was never known by any

other name than Dohrmann until after the death of Jose
Maria de Laveaga; according to his own testimony he was
informed for the first time that his name was Laveaga by Dr.
Wilhelm Dohrmann a year before the death of the latter,
which occurred in 1886; Anselmo never assumed the name
Laveaga until a year after Dr. Dohrmann's death and not
even then did he prefix the particle "de"; never until the
year 1895 did he assume the aristocratic cognomen; not un-
til fourteen years after the death of Jose Maria de Laveaga
did Anselmo take that name; when the boy was taken to the
Cosmopolitan School July 9, 1877, he was entered as "Will-
iam Dohrmann," son of Dr. Wm. Dohrmann: was that an
acknowledgment by Jose Maria of paternity and heirship?
At Dr. Buehler's German-American School he was known as
Joseph Dohrmann; at none of the various schools was he
entered or known as Laveaga or "de Laveaga," always as
Dohrmann; so at the Industrial School whence he wrote to
Dr. Dohrmann signing as "Your beloved son, W. J. Dohr-
mann"; at all the schools Dr. Dohrmann was put down as
"parent or guardian" in the column so headed. All this
is singularly significant so far as the name signifies no pub-
lic acknowledgment. Until long after the death of Jose
Maria this boy was known as a Dohrmann everywhere and so
notoriously so that Mrs. Paulsen, daughter of Dr. Dohrmann,
protested. How then can it be claimed that this boy was
publicly acknowledged by Jose Maria de Laveaga when that
alleged sire never gave his scion the family name, that surest
token and most satisfactory sign of public recognition and
paternal acknowledgment? Mr. Justice Works, 81 Cal. 458,
21 Pac. 976, 22 Pac. 742, 6 L. R. A.

Mrs. Blanca Paulsen, daughter of Dr. William Dohrmann,
complained to him that the boy was wild and that she did
not want her family name brought into reproach by his es-
capades, as her brother's boys were in the same school and
ought not to be implicated on account of name with him in
his juvenile misdeeds, but still Jose Maria did not grant the
use of his distinguished patronymic to this mischievous lad
universally known as Dohrmann to the distress of this sen-
sitive lady. In view of the facts in evidence it cannot se-
riously be maintained that Anselmo, the boy claimant was

ever publicly acknowledged or instated as the heir of Jose Maria de Laveaga and his relatives, neither by giving him the family name nor by receiving him into the family nor by the conduct of Jose Maria in doling out certain alms for him in the nature of corporal works of mercy. What did he do for the boy prior to his advent from Mexico? Nothing. After that, when the child came to this city, the attitude of Jose Maria was to be construed at most as that of one occupying a middle ground, a mere recognition by him of a charitable claim but not an acknowledgment. Can the treatment of this boy in such a manner make him heir?

As to the name by which the boy was known in the neighborhood of his foster home and at school, it is clear that it was not his true name, for it is in proof that he was baptized Anselmo Jose Maria, and that he was not related by blood or marriage to the Dohrmanns; but it was natural that living in their family and being sent to school from their house their name should be entered on the record, with the name of Dr. Dohrmann as parent or guardian. It cannot be inferred, however, from this that Jose Maria denied and disowned the boy publicly in the neighborhood, nor in the school world. His placing the boy in the home of Dr. Dohrmann for care and culture conferred no authority upon the doctor to change the boy's name nor to enter himself as his parent or guardian on school registers. The doctor's acts in this regard were not those of the actual father. Jose Maria placed the boy with him under the name of "Joseph," and paid for him according to the agreement, and there the paternal acts in that connection ended. Whatever the doctor did, whether of whim or affection toward the boy, in calling him by his own name cannot impair validity of the accomplished act of the true father under the statute, and it was plainly not pleasing to some of the members of the family, at least one of whom was angry at the assumption that the boy was a Dohrmann, for this one, Mrs. Blanca Paulsen, the daughter of the doctor, testified that she had always known the boy as "Joseph Laveaga" since he was five years old; she first saw him at her father's house on Bryant street; she had seen the senior Joseph at her father's house, at the store of B. Nathan & Company, at her brother Adolph's house, where

she lived for a time, and where he used to call frequently; he had told her in the German language that this Joseph was his boy, and she said to him in German that he ought not to call the boy Dohrmann, as anything wrong he did at school was attached to the Dohrmann family and that the boy ought to take his own name, and he answered to this that that would be all right later on. Mrs. Paulsen was naturally not pleased that the boy was brought up on her father and she complained, but Jose Maria said that it would be all right in time, he was affectionate toward the child, treated him as a father would, he called him "Joseph," simply Joseph.

The conversation as related by Mrs. Paulsen in German was as follows: "Warum nimt Ihr Sohn nicht seinen Nahmen, wir wollen nicht das mein Bruder sein Kinder unter seine Unnathen leidet, Mr. de Laveaga antworte lassen Sie es nur gehen spater wird er schon seinen eignen nahmen nähmen," which is thus rendered into English: "Why does your son not take his name, we do not want that the children of my brother suffer for his naughtiness? Mr. de Laveaga answered: You let it go only, later he will take his own name."

All the witnesses for the claimant testified that the boy was always called "Joseph" by Jose Maria, and the witnesses so called the boy, among them Abraham Bachert, who used to visit the house of Dr. Dohrmann very often with Jose Maria, and who had known the boy from his fifth year when the child spoke Spanish and later on German, which was all he could hear in that house and which he picked up quickly, as a child might; Bachert always called the boy Joseph, saw him and Jose Maria together; the latter said to Bachert "This is my boy," or "my son"; "Here is my child, is he not a nice looking boy, does he not look like me?" Bachert would respond affirmatively; he saw the two together often in that house, also at the store of B. Nathan & Company, and at "The Fountain," a family restaurant and amusement resort, with Dr. Dohrmann. Jose Maria used the words in German "mein sohn," in reference to the boy, those words mean "my son"; Bachert also saw Jose Vicente frequently and went with him often to Dr. Dohrmann's house; sometimes Jose Maria and Jose Vicente and Bachert went there

together, and the boy was there at such times; the conduct of Jose Maria was very affectionate toward the boy when alone and the same when Jose Vicente was present; Jose Vicente called the boy "Joseph"; Jose Maria was pleased with the boy's learning German and so said to Bachert, to whom he always spoke in German.

Mrs. Augusta Von Bendeleben testified to a long acquaintance with the boy and his father, who spoke of the boy as "Joseph" and called him his son; she also knew Jose Vicente and saw him when the boy was present at Dr. Dohrmann's and heard Jose Vicente call the boy, "Joseph."

Bernard Nathan, the founder of the firm which is now Nathan, Dohrmann & Company, and in which Frederick W. Dohrmann has been from the start a partner, knew the latter's father ever since his arrival in San Francisco; he also knew Miguel A. de Laveaga, and his brother Jose Vicente and Jose Maria, the last named of whom he became acquainted with first, and called him Joseph; Nathan conversed with them all in German, which they spoke splendidly; he saw Jose Maria most, saw him at the Nathan store and also at the house of Dr. Dohrmann on Bryant street where they were accustomed to gather to celebrate the old doctor's birthday and on other festive occasions; Vicente came into the store of Nathan quite often; Nathan first saw the claimant when he was six or seven years old at the house of the doctor, the boy spoke Spanish at that time; Jose Maria told Nathan once that he had a boy whom he had brought from Mexico and left with Dr. Dohrmann; this was told in German, Jose Maria said "Mein junge," which means "my boy" or "my son," and he seemed to be very affectionate toward him; he called him "Joseph" when he used any name and when he did not use any name he said "mein junge"; Nathan always knew the boy as "Joseph"; that was the only name by which he was called so far as Nathan knew; Nathan had many conversations with Jose Maria, in one of which he said that he was very well satisfied with the treatment that the boy received at Dr. Dohrmann's and that he was glad he left him there; all that Nathan knew on that subject he learned from Jose Maria, who always spoke in German.

It is clear from the testimony of these and other witnesses that Jose Maria always called the boy "Joseph" or "Joe" and nothing else; that is shown by his letters to Dr. Dohrmann, the very last one in 1879 so naming him. All the time the boy was at school under the name of "William" on registers during the life of Jose Maria, the latter was in his letters calling him "Joseph." Evidently Jose Maria knew nothing of this "William" as applied to the child. It certainly was not authorized nor connived at by him for purpose of concealment of his relations to the boy, and was contrary to all his public declarations and documentary formalities, and it cannot be held to modify, much less to destroy, a status already acquired. In this connection it may be said that the spirit of Mrs. Paulsen's testimony is that the name by which the child was known at school was the doctor's work, that Jose Maria considered it of little importance when the child was young, and that it was not done by either the doctor or Jose Maria to conceal the relationship which actually subsisted between the latter and the child, and, therefore, has no adverse bearing upon the question of acknowledgment, to which only is it material.

It may be added that it is natural and common for children to take the name of the people by whom they are reared, as the records of this and other courts will show in cases of change of name by judicial process for the reason that the person has been usually or universally known by another than the birth name. It may also be added that in cases of adoption under sections of the Civil Code from 221 to 229 the child frequently retains its original name, not assuming the family name of the person adopting, thus presenting an apparent incongruity. When the name "Sanchez" was used in the actum it is inferable that it was because the author of that instrument regarded it as the formal legitimation, so giving the boy his mother's name as that which before the final legitimation the boy was strictly entitled to. The paper itself was, as its statement claims, simply a draft or preliminary instrument preparatory to the execution of a proper notarial document, which the writer in his ignorance of the law deemed essential to effectuate his design. His lack of legal lore, however, and crudeness of performance cannot alter

the character of the act if it in itself is such as the statute prescribed, for when the acts necessary to legitimize a natural child conform to the statutory prescription they confer legitimacy without any reference to the intent with which they are performed: Beatty, Chief Justice, 81 Cal. 435, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.

In his will or testamentary disposition referred to in the actum and made some time prior thereto, Jose Maria described the boy by his three full Christian names, using no surname at all, ''My son Anselmo Jose Maria,'' as he himself was described in the will of his own father, the senior Don Jose Vicente, simply as ''my son, Jose Maria,'' and in like manner described his other children by their first names only.

Likewise in the will of his mother Dona Dolores Aguirre de Laveaga executed December 30th, 1881, in which occurs the following clause:

''Cuarto. Como he llegado a oir que mi finado Hijo Jose Maria, Soltero dejo uno o mas hijos habidos fuera de Matrimonio, ahora declaro que no reconozco a semejante hijo o hijos como nietos mios, y que si no les lego nada, lo hago con todo conocimientos e intencion. Y ademas anado que, un cuando posteriormente se presentara alguna Muger reclamando haber sido esposa de mi citado hijo y a finado, es mi voluntad e intencion el no legar nada, ni a ella mi a los hijos que ella presentara.''

The foregoing may be more or less correctly translated as follows:

''Fourth. As I have heard that my dead son Jose Maria, unmarried left one or more Sons born out of wedlock I now declare that I do not recognize such son or sons as my grandchildren, and if I leave them nothing I do so with full understanding. I furthermore add that although at the outcome some woman may present herself claiming to have been wife of my said son deceased it is my Will and intention to leave nothing neither to her nor to the children that she may present.''

Whatever the claimant did as a child could not alter his legal situation nor estop him from claiming the benefit of the acts done by his father; nor can he be held bound by what he was induced to do by Jose Vicente, and so far as the conduct

of the latter is concerned it is shown that he was cognizant of the circumstances and strove in his sagacity to bind the boy and to estop him from asserting any claim to his father's estate when he should discover his legal rights; but, of course, the acts of the boy could not operate such estoppel. The receipt for the gold watch given in 1888; the letter of the boy signed "J. M. Laveaga" written to Jose Vicente thanking him for his gift of the property described in the deed were the work of Jose Vicente, and the signature was so written by his request because he did not want the boy to use the particle "de," and therefore it was omitted. The deed dated July 2, 1889, was the document which described the property for which the boy thanked Jose Vicente in that way. Both the receipt and the letter are dated subsequent to the codicil in which Jose Vicente refers to the boy as the acknowledged son of Jose Maria; this codicil is dated March 14, 1887 and described "Joseph Laveaga, by my late brother J. M. de Laveaga, acknowledged son of his," and this codicil, as well as various other parts of the will of which it forms a part, points to the knowledge possessed by this family of the relationship which the claimant bore to Jose Maria. The conduct of Jose Vicente leaves no room for doubt, in the mind of the court, that he was thoroughly acquainted with the fact almost from the day of the boy's arrival at the house of Dr. Dohrmann, and that he saw him there in the presence of Jose Maria, and that he knew the whole story of the support of the boy and the reason therefor by Jose Maria, and it is fairly inferable that what he knew was also known to other members of his father's family, although it may be that it was not a common topic of discussion in the household and was hardly fit for the ears of the young sisters of his, and it could scarcely be expected that the subject could be a welcome theme for treatment in the family circle whence the father was expelled in June, 1868, and from which he continued to be excluded forever after. But it is said that this is not established by the evidence, for the letters of Jose Maria and testimony of Miguel and Mrs. Cebrian show the contrary, and prove that Jose Maria had a home into which to receive this boy and into which he was never introduced. Mrs. Cebrian says that the reason why Jose Maria left home was late hours. Jose Maria left the

paternal home June 13, 1868, when this lady was between twelve and thirteen years of age, she having been born October 27, 1855. On the day of his departure he wrote to his father a letter of which the following is a translation:

"San Francisco, June 13th, 1868.

"Mr. J. V. de Laveaga,

"Present,

"My father:—

"I ignore up to this moment what Vicente might have done. I have thus sworn it to my mother and I swear and verify it by this.

"If Vicente had done anything, I have not induced him to do it and let him shoulder the responsibility. Notwithstanding the statement, my mother told me I had no religion and therefore my oath was of little importance. She told me I had one of the blackest hearts and a little face of Saint Anthony with the soul of a Demon. That I did not love any one of my family; that it seemed to me that you both were living too long, and a great many other inculpations. I limit myself to record these fresh as they are, for memory's sake.

"After this what could I answer that would be believed in the truth of my explanation? Nothing.

"Why should I have the unnatural sentiment, that it would seem to me that you both were living too long? Deduction? Inheritance? Formally and in whatever manner required I renounce it, thanking my father for what he has done for me, so that I can support myself through my own self, and if by doing so I can wipe out from my mother's mind such a terrible thought.

"My resolution is taken, and if I find the approval of my father at least to the extent that he should not curse me, I will to-day deliver of such a terrible monster those who wish to make him appear thus, by moving somewhere else, and may they answer for what may befall to your son,

"JOSE MARIA."

The receipt of this letter is acknowledged by the father, the senior Don Jose Vicente, by a memorandum in his handwriting appended to it on the same paper, translated as follows:

"June 15, 1868.

"At seven in the afternoon I received this, and I answered him by common consent, that he was free of the home control; since that night he has not slept at the house. Since February he is employed with Mr. T. Lemmen Meyer, earning one hundred dollars per month."

It would appear from this that there was some deeper reason for his departure from home than late hours, and it does not appear that he and his father ever came together again until the latter's last moments. It may be true, as Miguel testifies, that his father went to Lemmen Meyer's nearly every day where he could have seen Jose Maria, but it does not appear that he ever saw or conversed with him at that or any other place during this period. After Jose Maria left his father's house in 1868 to 1875, when he purchased the ranch, to 1876, when he moved to San Benito permanently, to 1879, when he returned to San Francisco, where he sojourned for a short season bankrupt and homeless until he left for Colorado in December, 1879, dying in Denver April 21, 1880, he could not be said to have had a home of his own in which to rear and educate a tender child. He was barred from his father's house by the act of that father, which did not cease to operate with his life, and by his will was perpetuated in the request to his wife "not to allow my son Jose Maria to reside with her and my daughters; if they marry she may or may not consent thereto. The peace and convenience of all my children requires it should be so." So from home he was still an exile; although he was abiding in the vicinity at times, he was a mere inmate of a lodging-house, with but one room for his accommodation; there was no return of the prodigal son to his father's house and no invitation thither when he returned from the ranch in the winter of 1879, and Miguel swore that he did not know where Jose Maria lodged in that interval. If it were legally requisite that he should take the boy into his "home," he had no such domestic establishment; but the law did not require this; the expression is not "home," it is "receiving into his family," which means, in the case of a bachelor, receiving him under his care, protection, custody, and control, and may be accom-

plished by such means as the father considers proper; but counsel says that while Jose Maria was at the Rancho Los Aguilas he had there a home which could have been made fit to receive this child and he was not there received at all. The reason for this may be found in the testimony of Peter Andresen, a resident of Santa Cruz, and a beneficiary in the will of Don Jose Vicente, the younger, and with whom he was on fairly intimate terms. Andresen testifies that he came to California in June, 1868, from Illinois, having been born in Germany; he lived in San Francisco until 1875 when he went to Santa Cruz and remained there until 1878, when he returned and went into business at Sutter and Montgomery streets, as a merchant tailor; in September, 1879, he went to Mazatlan, Mexico, he came back and settled in Santa Cruz in 1880 and since continued there; he knew Dr. Wilhelm Dohrmann very well, became acquainted with him in Woodward's Gardens at the celebration of the German victories over the French, and the year after that Andresen began to visit the doctor's house; the doctor was a jovial gentleman and Andresen liked his company very much; they used to meet very often at "The Fountain," in the basement southeast corner of Sutter and Kearny streets, a family restaurant and beerhall where Dr. Dohrmann and his friend F. A. Schroder used to visit. Andresen became acquainted with Jose Vicente de Laveaga, used to make his clothes when cutter for Wright & Harmon, merchant tailors, 539 California street, corner of Summer; they used to ride horseback early in the mornings two and sometimes three times a week; they often met at a place corner of Clay and Dupont streets where there was a drink called "Knickebein," which they were accustomed to imbibe and enjoy; they also went at times to Kunstler Hall, Mayrisch's place, a very respectable resort, on the corner of Clay and Kearny streets; Andresen always visited Dr. Dohrmann's house in company with Jose Vicente. Andresen made a visit to the ranch Los Aguilas on one occasion when Jose Maria gave him a great reception and asked him when he was last in San Francisco and when he saw his son at Dr. Dohrmann's; Andresen asked Jose Maria where his son was born and why he did not bring the boy to the ranch, Jose Maria answered that the boy was born in

Mazatlan and the reason why he did not bring him to Los Aguilas was that it was no place for him, no women there, no schools, and the boy was better off in San Francisco where he was well cared for; this was in 1878, when he spent four days at the ranch and had a good time with Jose Maria.

It thus appears that Jose Maria did not take the boy to his ranch, not because he wanted to conceal the relationship, and this is the material bearing of such evidence, if we construe the statute correctly, but because the boy was better off at Dr. Dohrmann's house; the ranch was an unfit place for a child; Jose Maria's own habits were not exemplary; he was not really the master of the situation from April, 1877, until he quit, he was but a pensioner all that time; he was inpecunious from the start, had a mistress there much of the time, and the situation was altogether unsuited for the mental and moral cultivation of this child. Certainly he was better off, if life at the ranch is faithfully depicted in the record, by being kept in the house of his friend Dr. Wilhelm Dohrmann under the agreement to pay for his board and care and education at the rate of one dollar a day, which agreement was carried out to the extent of the ability of Jose Maria during his lifetime, as is proved by the little volume called "Joseph's Book," which shows by the entries made therein payments aggregating $1300 during five years, or an average of $260 a year from and including 1874 to and including 1879.

This fact of support is further proved by Hansen, by F. W. Dohrmann, by the letters of Jose Maria to Dr. Dohrmann, by the letter of May 4, 1875, to Jose Vicente, and by his letter to Miguel dated July 2, 1879, and that his own death should not leave the boy destitute further provision was made by the will of November 8, 1877, in which all his estate was left to his son, this claimant, with the understanding that he should not enter into possession until his majority and when he had acquired a profession, and for this purpose it was enjoined upon the executors to give him a thorough education, and in the event of his death everything to go to Jose Vicente. When he became bankrupt Jose Maria commended this boy to Vicente's care. His letter to Vicente of October 31, 1879, inclosing the copy of the letter to Dr. Dohrmann of October 29, 1879, serves to substantiate this claim.

It is shown also that the balance of the debt due for the board of the boy was liquidated by Vicente, and that Jose Maria's safe was sold by Vicente's orders, and proceeds applied to the same purpose. A great number of letters, three or four hundred, have been introduced to show the existence of friendly relations between Jose Maria and other members of his family; about three hundred of these are to Vicente, and forty or fifty to Miguel, but they do not militate in any wise against the claimant's position, for it is not denied that Jose Maria was friendly with Vicente to the last, as is shown by his letter to Dr. Dohrmann and his will; the letters to Miguel are mere business letters nearly all written in the years 1878-79, the whole of them having little importance with respect to the issues of this controversy, certainly they are in no sense sufficient to overcome the evidence in favor of claimant. Some of these letters, the two to his father and the two to Vicente and Miguel showing payments to Dr. Dohrmann, were produced with apparent reluctance, as also the letter to Vicente inclosing the copy of letter to Dr. Dohrmann concerning the claimant. But, it is said, that, in these contributions to the support of the boy, Jose Maria was at most simply occupying a middle ground and merely recognizing a charitable claim, which by no means amounted to an acknowledgment of status. This argument is more creditable to the ingenuity than to the candor of counsel.

Reverting now to the will and the actum; the fact that these documents with the other effects of Jose Maria passed into the possession of Jose Vicente and were suppressed until August 14, 1894, is to be taken into account as a most significant circumstance.

In the interval succeeding the death of Jose Maria, Dr. Wilhelm Dohrmann died in June, 1886, and his wife Dorathea, in 1894, carrying out to the end the trust assumed at the instance of the natural father of this claimant.

Whose fault was it and whose accountability that the claim of this boy remained so long in abeyance? Upon whom was enjoined the duty of making manifest the full truth concerning the claimant? To whom was committed the care of the future of this child and upon whom was imposed the obligation of giving him a thorough education for some profes-

sion suited to his station and capacity? Who was to benefit by the death of this boy?

By the suppression of these documents and by these deaths the evidence of the boy's rights might be supposed to have been destroyed, but after the death of Jose Vicente and the admission to probate of his will the truth came out and the papers were found to be preserved. Jose Vicente died on August 14, 1894, and after that event Daniel Rogers, one of his executors, in company with Miguel A. de Laveaga, examined his private box in the safe deposit vault and found certain papers therein which Rogers delivered to Frederick W. Dohrmann; these papers were in one envelope indorsed "The Will of Jose Maria de Laveaga," and another indorsed "To be delivered to Mr. Dohrmann after his death"; one envelope was superscribed in Spanish "Testamento de J. M. de Laveaga, fha. Nov. 8/1877," the other in German "Im Falle meines Todes an Herrn Dr. Wm. Dohrmann abzugeben-535 Bryant St.," in black ink with the interpolation in pencil, "or F. Dohrmann, San Francisco," the German of which rendered into English is, "In case of my death to be given to Mr. Dr. Wm. Dohrmann or F. Dohrmann." It is in evidence that the superscriptions on the first envelope alluded to hereinabove and on the second were in the handwriting of Vicente. These papers, according to the testimony of Rogers, were found by him in the safe deposit box belonging to Jose Vicente de Laveaga in the vaults of the California Safe Deposit and Trust Company sometime in the month of August, 1894, after the death of Vicente, and were by Rogers delivered to Frederick W. Dohrmann, one of the persons named in the will of Jose Maria as executor thereof, the other executor being the deceased Jose Vicente. For all the years between the death of Jose Maria and that of Jose Vicente these documents were in the possession of the latter and by him suppressed in derogation of the rights of this claimant.

This will was an act deliberate in its production and uncommonly circumspect in its execution. The testator not content with its statutory sufficiency as an olographic instrument added in his own handwriting an attestation clause in full form and called in to witness two persons, A. M. Abrego and Green Devaul, who were at that time employed on the

Rancho Los Aguilas. With unusual solemnity was this testamentary act accomplished. The circumstances of the attestation were testified to in this case by Abrego and Devaul, the former of whom said that he signed the paper as a witness about 8 o'clock in the evening after supper; it was customary for him after supper to go to bed, but on this occasion Jose Maria asked him to remain up for a while and then he asked him to sign the paper; Jose Maria asked Abrego to call in Elias, the cook, to act as another witness, but this person coming in, said his hands were not clean, he was engaged at his work, and then Green Devaul, a ranch hand, was brought in, and Jose Maria read aloud the document and then declared it to be his last will and signed it and asked Abrego and Devaul to sign as witnesses and they did so, and that ended the transaction of the execution of the will.

Green Devaul's story of the way in which he came to sign as witness was this: Sometime about November 1st, when Devaul was at the little place where the workmen stayed on the ranch Santanita, about four miles from Jose Maria's house, a little boy came over with a note from Jose Maria requesting Devaul to go there on that evening and he went; it was dark when Devaul reached there and he put his horse in the barn and went in and sat down by the fire a little while; supper came down and they had a drink or two and then supper; after the meal was consumed Jose Maria produced cigars and they had a smoke; after the cigars they turned around to the fire and in a short time Jose Maria took a small table and hauled it up to the fireplace to where they were seated, and he took out this document, the will, and said: "Mr. Devaul, I am making what we call a testament." "Well," said Devaul, "Mr. Laveaga that is what we Missourians call the Bible." "Well, all right," he said, "we shall call it a will"; then he said, "I wish to have you and Mr. Abrego witness this will." Devaul refused to do it for a while but finally subscribed as a witness and after that they resumed their cigars and turned around to the fire and sat and smoked, "me and Mr. Abrego." Devaul thought Jose Maria signed the will at the time, but was not positive; the testator was doing something as Devaul was sitting at the back of him, the witnesses just turned around, the table was

behind the witnesses then; he said, "Mr. Devaul, this is Vicente de Laveaga; once in a great while we change our wills; sometimes he makes his will in my favor and then again I make mine in his favor," that is just what he said as near as can be recalled; Jose Maria took up the will then and he read it and turned it back to the witnesses two or three times and laid it down; according to that will Devaul said that Jose Maria gave his property to Vicente de Laveaga; Devaul never read that document nor did Abrego read it in his presence; Jose Maria did not tell them anything as to its contents; he read part of it to them; Devaul supposed he read the whole will; Jose Maria turned it over a time or two and read it and said, "Mr. Devaul, I have willed this property to my brother Vicente de Laveaga"; Jose Maria made no mention of the child, said nothing about a son or child; Devaul arrived at the house about 6 or 7 o'clock in the evening before supper, and remained continuously in the house until the will was signed and was during all of that time in the company of Jose Maria and Abrego; so far as Devaul knew that paper was prepared before his arrival; the document was not written after he arrived; Elias, the cook, was not requested to be a witness so far as Devaul knew; when the boy arrived at Santanita with a message from Jose Maria it was about 4 o'clock in the afternoon; it was after the witnesses had eaten supper with Jose Maria that the latter acquainted Devaul with the reason for wanting him there; the conversation at table was in the American language; Devaul did not hear Jose Maria talk any Spanish that night; and while the business was going on the cook was cleaning off the table; the will was signed on a small table by the fireplace, in the small room off the dining-room; it was all done as related, testified Devaul.

So far as these witnesses differ in detail, the advantage is with Abrego, as his story seems consistent and correct and there are certain intrinsic infirmities in the testimony of Devaul that suggest mistakes in memory; but they agree in the essentials of the execution and as to all apart from that the court does not consider it important, in the face of the entire record.

It cannot be doubted, after an examination of the evidence in this case on all sides, that the claimant was acknowledged in the strictest and fullest sense to Jose Vicente. It does not matter what construction, as to legal effect, Vicente placed upon the acknowledgment, for his views of the law had nothing to do with the case. The controlling factor was the act of the father Jose Maria, and that act was communicated to Vicente by Jose Maria and during the latter's life. It was known that Jose Maria recognized the boy as his son and supported him and the continuation of this support was commended to Vicente after the father's death, and by his acts it is shown that Vicente accepted the responsibility as the result of his knowledge of the boy's origin and rights. To say the least, it is improbable that Miguel and Mrs. Cebrian were not acquainted with the facts. Mrs. Paulsen and others testified that they saw Miguel at Dr. Dohrmann's house after the boy arrived which was September 21, 1873; but Miguel swears that he ceased to visit that house before September 22, 1873, the very day after the boy was placed there, this date being fixed by a letter from Miguel to Jose Vicente dated September 22, 1873, which is connected with the previous letter dated August 27, 1873, which contains this paragraph in reference to his social relations with Dr. Wilhelm Dohrmann, "The old doctor and I amuse ourselves tremendously. We go very often out fishing on Long Bridge, and also catch an enormous amount of fish. On Thursday I brought home about sixty, among them one that weighed a pound and a half"; the other letter dated September 22, 1873, and postmarked September 23d, contains at the close the sentence, "On account of father's sickness the fishing has ceased." Miguel swore that he did not remember ever having been in Dr. Dohrmann's house after the date of that letter, although prior to that time he was and had been in the habit of visiting the old doctor quite frequently and socially. It is rather a remarkable coincidence that the cessation of these visits occurred the day after the arrival of the boy. Miguel also testifies that he had a conversation with Jose Maria in relation to a boy who was domiciled, or whom he intended to domicile at the house of Dr. Dohrmann; this conversation occurred sometime in the summer of 1873; Jose Maria told

Miguel that there was a woman in Mazatlan who was constantly writing him for money for the support of the boy, whom she claimed to be his illegitimate child, but Jose Maria said that he did not think it was his child, because the woman used to run around with other men; at the same time he thought of bringing him to San Francisco and putting him under the care of Dr. Dohrmann, and that he would do so on account of his being afraid that the woman might write to his father; that was the only time that Jose Maria referred to the boy, so far as Miguel could remember, although he thought that Jose Maria might have told him that the boy had come to Dr. Dohrmann's. Miguel testified that to the best of his recollection he never saw this claimant Anselmo in the lifetime of Jose Maria, nor at all until after March, 1888.

Miguel is mistaken in memory; his recollection must be at fault in several particulars which do not chime with the established circumstances of the case. As to Miguel's narrative of his interview with Jose Maria in the summer of 1873, there are in it certain indicia of improbability:

1. Basilia was dead a year prior to that time and Juliana was totally illiterate; if she secured the services of another to conduct correspondence the letters should have been produced to prove the assertion of blackmail or an attempt in that direction.

2. Why did it take five years for this alleged design to culminate or come to a head?

3. Why bring the boy here to escape blackmail and quintuple the cost of maintenance over that in Mexico?

4. Why, to escape a communication by the blackmailers to Jose Maria's father, bring the boy to San Francisco in the face of that father, as it were, and into the house where Miguel and Vicente visited frequently, and during that father's last illness with the natural danger of disherison?

5. It is not shown that Basilia was a promiscuous person; on the contrary it is established that except for the incident which was the inception of this controversy she was innocent.

There are other considerations impairing the value of Miguel's recital, which it is unnecessary to discuss in detail

here, considering the weight of evidence opposing his state-
ment.

Apart from the testimony of Miguel and Mrs. Cebrian there
is nothing in this record to point to a denial; mere silence
and nonallusion to him has no more weight than other nega-
tive testimony. The oral evidences of admissions of paternity
and acknowledgment are abundant and unrefuted and come
from credible sources, almost without exception, and if it
be said that for the most part they belong to the Dohrmann
environment, so also did Miguel, who was, according to his
own testimony, a daily and nightly associate of the doctor,
and so also was Jose Vicente, a friend and familiar of the old
doctor and his son, Frederick W. Dohrmann with whom he
was coexecutor of Jose Maria's will, and to whom he directed
the written evidences of this boy's status which furnish the
irrefragable muniment of his title to a share in the name
and estate of de Laveaga. Jose Maria orally declared his pa-
ternity and acknowledged this boy to nearly a score of per-
sons in various walks of life and in different occupations and
living apart from each other, although some of them mingled
in social intercourse in respectable resorts and frequently met
at the house of the old doctor on his birthday and other fes-
tive occasions where there were about as many de Laveagas
as Dohrmanns present; as Miguel himself says, Jose Vicente
and he used to visit the Dohrmann house and play chess at
times with the old doctor, and they all used to visit Kunstler
Halle and play cards, whist three or four times a week, poker
about every evening, and other games and sometimes they met
for their pastime at the room of Jose Maria.

Witnesses of this class cannot be whistled down the wind by
insinuations that they are below the social grade of those who
voluntarily seek their society and court their company. As
against such witnesses on the score of oral declarations there
is nothing substantial but negative testimony: Estate of Jes-
sup, 81 Cal. 456, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.
There is no contrary evidence as to declarations denying
paternity except by Miguel and his sister Mrs. Cebrian. As
to Miguel's testimony on this point it does not avail at best be-
cause the statements are alleged to have been made in the
summer of 1873 before Jose Maria had the boy brought to San

Francisco or made up his mind to legitimate him. All the allegations of the cross-petition for this claimant are proved by ample, oral and documentary evidence uncontradicted and unimpeached. There is no evidence against care, custody, support, control or education, and these constituents of reception and otherwise treating and acknowledgment must be taken as proved clearly and fully. The evidence opposing the cross-petition points merely to the question of publicity of acknowledgment and consists only of alleged single declarations by Jose Maria in the summer of 1873 before the boy came to San Francisco and a single declaration to Mrs. Cebrian in 1877. Even if these denials be taken as true, they would not destroy the absolutely satisfactory evidence to the opposite effect adduced in behalf of claimant. It can scarcely be said seriously that such evidence could destroy the will, the actum, and the other documents, and all the oral proofs. Even if there were no reason for discrediting this testimony, as to denials of paternity, it is insufficient to counteract the ample and conclusive evidence of admissions of status. In itself the oral evidence in support of the cross-petitioner would warrant a decision in his favor. The will, the actum, and other documents later in date merely confirm beyond refutation or reproach the publicity of the prior oral acknowledgments, which in themselves satisfy the law.

The prayer of the cross-petition is granted.

---

Estate of de Laveaga was before the supreme court in 119 Cal. 651, 51 Pac. 1074; 142 Cal. 158, 75 Pac. 790.